Argued April 26, affirmed June 13, reconsideration denied July 26,
petition for review denied September 26, 1978

HIX, *Appellant,*

*v.*

STATE ACCIDENT INSURANCE FUND
et al, *Respondents.*

(No. 77-1126-E-2, CA 9566)

579 P2d 896

Richard A. Stark, Medford, argued the cause and filed the brief for appellant.

C. H. Seagraves, Jr., Grants Pass, argued the cause and filed the brief for Employer-Respondent.

Stephen D. Brown, Medford, argued the cause and filed the brief for State Accident Insurance Fund-Respondent.

Before Schwab, Chief Judge, and Johnson, Gillette and Roberts, Judges.

GILLETTE, J.

## GILLETTE, J.

In this Workers' Compensation case, the sole question is compensability. The claimant, who was sixteen at the time, suffered an injury to his arm while attempting to clear a moving conveyor belt at the Gold Hill Lime Plant. The arm was subsequently amputated. The referee found claimant not to be an employee under ORS 656.005(28) of the Workers' Compensation Act, which provides:

> " 'Workman' means any person including a minor, whether lawfully or unlawfully employed, who engages to furnish services for a remuneration, subject to the direction and control of the employer * * *."

The Workers' Compensation Board reversed the referee. The circuit court in turn reversed the Board. Claimant appeals. We affirm.

In setting out the facts, we borrow extensively from the opinion of the referee. Sanders, the employer, set up the lime plant in the Spring of 1975. The plant utilized equipment for pulverizing lime, moving it on a conveyor belt to a screen to separate out the larger particles so that the pulverized lime could be transported by truck to customers. Claimant's father, Wally Hix, assisted in setting up the lime plant in anticipation of hauling the processed lime to customers. He was unpaid for the work which he performed; he worked primarily for the purpose of getting his truck into service, and partly as a matter of friendship with Mr. Sanders.

Claimant, Wally Hix' 16-year-old son, was on the lime plant premises because he was on summer vacation from school, enjoyed the companionship of his father, and accompanied his father to the lime plant as a way of spending his idle summer hours. In June of 1975, Wally hauled five loads of lime in his truck from the lime plant in Central Point to Cave Junction, Oregon. After that delivery, apparently no market was found for the lime, or at least there was no hauling of the lime in Wally's truck until about August 20. From

August 20 until August 29, the day of claimant's injury, Wally hauled 40 loads of lime from the plant to a mint farm at Grants Pass. During the time of the lime hauling in August, both Wally and claimant spent a substantial amount of time with Sanders. According to Sanders' recollection, very little time was spent at the lime plant itself; more of the time was spent at his home and shop. The testimony of claimant was that he spent more than half of his time at the lime plant.

During the time when lime was being processed, claimant performed work directly related to the plant operation and of benefit to the plant operator. The work performed was principally that of shoveling up lime which had spilled off the conveyor belt. The amount of time spent was rather small. Sanders estimated that on the day of claimant's injury Wally and claimant had shoveled lime for about 10 minutes. In addition to the lime shoveling, claimant performed certain other activities about the plant. He and Sanders on one or two occasions spelled each other in operating a manual pump to pump diesel fuel into a loader, each pumping for about five minutes. Sanders testified that claimant "was real good" about doing things around the plant that needed doing.

Sanders recollection was that claimant had gone with his father in his truck for delivery of the lime to Grants Pass every day from August 20 except the day of the injury. Wally and claimant testified that claimant had remained at the lime plant about half of the time during the 40 deliveries that Wally made to Grants Pass.

In June, Sanders gave Wally a check to cover the hauling he had performed up to that time. Wally testified that Sanders instructed him to give claimant $40 out of the check "because he had earned it." Wally did in fact deliver $40 to claimant. Sanders testified that he didn't remember if the $40 was a gift from him to claimant but he recalled saying something to Wally

about giving $40 to claimant. On the day of the injury, Sanders gave claimant a $100 bill. He testified that he gave it to him to buy some school clothes and told him not to tell Wally about it because he wanted to be sure he got the clothes. Claimant testified that Sanders said the $100 "was for what I had been doing for him."

Sanders never discussed paying claimant with either the claimant or Wally. Wally testified that he knew claimant expected to be paid but he had not mentioned this to Sanders. Claimant testified that he was surprised when he was given the first $40 but for the later work done he was expecting about another $40; he was again surprised when he received the $100 bill. Sanders testified that he thought claimant had "earned part of $100 for the things he did without me or his father asking him to."

A written statement from Sanders in evidence includes the comment, "while the boy was there I would ask him to do some chores." He testified that he did ask claimant to do little things but he did not think that he had the right to control him. He testified that if claimant had refused to do something he had asked him to do he would have been very surprised but would not have told him to leave because he couldn't do so without his father being present. He never asked Wally to bring claimant with him or asked Wally to permit his son to work for him.

Wally testified that he did not recall Sanders ever having directed claimant to perform any particular work. He testified that claimant knew how the plant worked and what to do and simply went in and worked. He also testified that in August when he was making the deliveries to Grants Pass he would ask Sanders if he needed claimant and Sanders would indicate whether or not claimant should stay at the plant or go with him. As to whether he should stay at the plant or go with his father claimant testified that Sanders would "tell me to stay or go" and whenever "he kept me there he had some work for me to do."

As we view the evidence, it establishes that claimant's performance of services was gratuitous, and the payment of a total of $140 to claimant by the employer was equally gratuitous. Claimant's involvement in the operations of the Gold Hill Lime Plant began and continued in furtherance of his father's efforts to find work for their dump truck. All of the activities of claimant and his father were designed to further the father's business interest in having lime to haul for profit. Moreover, the son was friendly with the employer, Mr. Sanders, and obviously wished to do him a favor. The claimant came to the lime plant only when his father came, and then only if he wished to. Sanders could thus never rely in advance on the claimant's availability. While on the premises, it is true that the claimant performed various "chores" and services for Sanders, some of them at Sanders' request. However, Sanders expectation that his requests would be met was based solely upon the compliant nature of the claimant, not upon any belief on Sanders' part that he had a right to direct or control the boy in any manner other than as an owner of the premises directing anyone on the premises.

We think it clear that the amounts of money paid by Sanders to the claimant were a recognition by Sanders of a moral obligation to remunerate claimant for his occasional services. No particular rate was set, and there was no agreement between the parties that any pay would be forthcoming. Even the expectation which the claimant testified to appears to us to have been more a reasonable hope based upon the mutual goodwill between the parties, rather than any kind of implicit contractual relationship.

Claimant relies upon *Buckner v. Kennedy's Riding Academy,* 18 Or App 516, 526 P2d 450, *rev den* (1974). That case, however, is not in point. There, a number of girls performed services in caring for horses at the riding academy in return for free lunches and occasional payment of money, and the right to ride the horses for free when other people had to pay $1.50 per

hour. The girls were subject to the direction and control of the owner of the riding academy, and he regularly exercised his right of control.

■ The burden of proof is on the claimant. *Cox v. SAIF,* 33 Or App 521, 576 P2d 1272 (1978). Here, it was plaintiff's burden to show the existence of the employer-employee relationship. As we said in *Oremus v. Ore. Pub. Co./Leibrand,* 11 Or App 444, 446, 503 P2d 722 (1973),

> "* * * there are two fundamental elements which must be present if an employer-employee relationship is to be found to exist: (1) a contract of hire between the parties, either express or implied, and (2) a right of control."

In this case, the evidence is insufficient to establish either an express or implied contract, or a right of control in the employer over the claimant.

Affirmed.